ROBERT H. ROTSTEIN (SBN 72452)
rxr@msk.com
EMILY F. EVITT (SBN 261491)
efe@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Defendants,
Allison Grodner; Richard Meehan;
Amy Palmer; Louise Roe;
Fly On The Wall Entertainment, Inc.;
MTV Networks Enterprises Inc.;
Sony Pictures Television Inc.; and
The CW Network, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELISSA TEDESCO,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SANDI PEPE, an individual;<br>PETER PEPE, an individual;<br>ALLISON GRODNER, an<br>individual; RICHARD MEEHAN,<br>an individual; AMY PALMER, an<br>individual; LOUISE ROE, an<br>individual; FLY ON THE WALL<br>ENTERTAINMENT, INC., a<br>California corporation; SONY<br>PICTURES TELEVISION, INC., a<br>Delaware corporation; THE CW<br>NETWORK, LLC, a Delaware<br>limited liability company; MTV<br>NETWORKS ENTERPRISES,<br>INC., a Delaware corporation; and<br>DOES 1 to 10, inclusive,<br><br>　　　　Defendants. | CASE NO.  CV 11-06203 JFW (JCx)<br><br>The Honorable John F. Walter<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANTS ALLISON GRODNER, RICHARD MEEHAN, AMY PALMER, LOUISE ROE, FLY ON THE WALL ENTERTAINMENT, INC., MTV NETWORKS ENTERPRISES, INC., SONY PICTURES TELEVISION INC., AND THE CW NETWORK LLC, FOR SUMMARY JUDGMENT UNDER FED. R. CIV. PRO. 56; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Supporting Declarations, Statement of Uncontroverted Facts and Conclusions of Law, Proposed Statement of Decision, and Proposed Judgment Filed Concurrently Herewith]<br><br>Time:　　1:30 p.m.<br>Date:　　July 16, 2012<br>Ctrm:　　16<br><br>Trial Date: September 25, 2012<br>Pre-Trial Conference: September 7, 2012 |

1   TO THE CLERK OF THE COURT, ALL PARTIES, AND THEIR

2   COUNSEL OF RECORD:

3   PLEASE TAKE NOTICE that on July 16, 2012, at 1:30 p.m., or as soon

4   thereafter as the matter may be heard in Courtroom 16, located at 312 N. Spring

5   Street, Los Angeles, CA 90012, defendants Allison Grodner, Richard Meehan,

6   Amy Palmer, Louise Roe, Fly On The Wall Entertainment, Inc., MTV Networks

7   Enterprises Inc., Sony Pictures Television Inc., and The CW Network, LLC

8   (collectively "Moving Defendants") will and hereby do move, pursuant to Rule 56

9   of the Federal Rules of Civil Procedure, for an order dismissing in their favor

10  Plaintiff Elissa Tedesco's Complaint and the First, Second, Third, Fourth, and

11  Sixth Claims for Relief set forth therein.[1]

12  This motion is made on the ground that there is no genuine dispute as to any

13  material fact as to Plaintiffs' Claims for Relief for copyright infringement or unfair

14  competition under the Lanham Act and California Business and Professions Code

15  §17200 because Moving Defendants could not have had copied Plaintiff's work

16  given that Moving Defendants created their *Plain Jane* series before Plaintiff's

17  alleged creation of her reality show treatment (the "Treatment").  In addition, even

18  if *Plain Jane* had not been created before Plaintiff wrote her Treatment, Plaintiff

19  could not raise a genuine dispute as to any material fact regarding Moving

20  Defendants' access to the Treatment because, as a matter of law, Moving

21  Defendants did not have a reasonable opportunity to read the Treatment prior to

22  creating *Plain Jane*.

23  Moreover, Plaintiff cannot raise a genuine dispute as to any material fact

24  regarding the works' substantially similarity in copyrightable expression.

25  Because no infringement occurred, Plaintiff's claims for contributory

26
27  [1]  Defendants Sandi Pepe and Peter Pepe are not parties to this motion.  The Moving Defendants were not sued in the Fifth, Seventh, Eighth, and Ninth Claims for Relief.

1  copyright infringement and unfair competition under the Lanham Act and
2  California Business and Professions Code §17200 also fail due to their dependence
3  upon the success of the direct copyright infringement claim.  Moreover, the
4  Supreme Court's opinion in *Dastar Corp. v. Twentieth Century Fox Film Corp.*,
5  539 U.S. 23 (2003) bars Plaintiff's federal and state unfair competition claims
6  because those Claims for Relief constitute impermissible claims sounding in
7  "reverse passing off" of creative material.  Finally, Plaintiff's state law unfair
8  competition claim is preempted by the United States Copyright Act, 17 U.S.C.
9  §301.

10        This motion is made following the conference of counsel pursuant to Local
11  Rule 7-3, which took place on May 14, 2012.  This motion is based upon this
12  Notice of Motion; the attached Memorandum of Points and Authorities; the
13  concurrently submitted Statement of Uncontroverted Facts and Conclusions of
14  Law, supporting Declarations, and Notice of Lodging; all pleadings and other
15  records on file in this action; and such further evidence and arguments as may be
16  presented at or before any hearing on the motion.

18  DATED: June 18, 2012                 MITCHELL SILBERBERG & KNUPP LLP

20                                       By: s/ Robert H. Rotstein
21                                          Robert H. Rotstein (SBN: 72452)
                                            Emily F. Evitt (SBN: 261491)
22                                          Attorneys for Defendants,
                                            Allison Grodner; Richard Meehan;
23                                          Amy Palmer; Louise Roe;
                                            Fly On The Wall Entertainment, Inc.;
24                                          MTV Networks Enterprises Inc.;
                                            Sony Pictures Television Inc.; and
25                                          The CW Network, LLC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

## **TABLE OF CONTENTS**

**Page(s)**

I.      INTRODUCTION .................................................................................. 1

II.     SUMMARY OF UNDISPUTED FACTS ........................................... 2

        A.      Defendants' *Plain Jane* Television Series ............................... 2

        B.      Plaintiff's Treatment ................................................................. 6

III.    MOVING DEFENDANTS ARE ENTITLED TO SUMMARY
        JUDGMENT ON PLAINTIFF'S COPYRIGHT CLAIMS ............... 8

        A.      *Plain Jane* Was Created Before The Treatment .................... 9

        B.      Plaintiff Cannot Raise A Disputed Fact As To Access .......... 11

        C.      *Plain Jane* And The Treatment Are Not Substantially
                Similar ..................................................................................... 13

IV.     THE UNFAIR COMPETITION CLAIMS FAIL AS A
        MATTER OR LAW. ........................................................................ 23

V.      CONCLUSION ................................................................................ 25

4568252.7/42500-00004

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

4

**CASES**

5
6
*A&M Records, Inc. v. Napster, Inc.*,
 239 F.3d 1004 (9th Cir. 2000)...................................................................23

7
8
*Aagard v. Palomar Builders, Inc.*,
 344 F. Supp. 2d 1211 (E.D. Cal. 2004)...............................................24, 25

9
10
*Apple Computer, Inc. v. Microsoft Corp.*,
 35 F.3d 1435 (9th Cir. 1994),
 *cert. denied*, 513 U.S. 1184 (1995) ..........................................................17

11
12
*Benay v. Warner Bros. Entm't, Inc.*,
 607 F.3d 620 (9th Cir. 2010).............................................................passim

13
14
15
*Berkic v. Crichton*,
 761 F.2d 1289 (9th Cir. 1985),
 *cert. denied*, 474 U.S. 826 (1985) .......................................................13, 15

16
17
*Bethea v. Burnett*,
 No. CV04-7690 JFW(PLAx), 2005 U.S. Dist. LEXIS 46944
 (C.D. Cal. June, 28, 2005) (Walter, J.)................................................passim

18
19
20
*Bissoon-Dath v. Sony Computer Entm't Am., Inc.*,
 694 F. Supp. 2d 1071 (N.D. Cal. 2010), *aff'd sub nom.*
 *Dath v. Sony Computer Entm't Am., Inc. and adopted by*,
 653 F.3d 898 (9th Cir. 2011) (published without opinion)...................passim

21
22
*Campbell v. Walt Disney Co.*,
 718 F. Supp. 2d 1108...............................................................................22

23
24
*Capcom Co., Ltd. v. MKR Group, Inc.*,
 No. C. 08-0904 RS, 2008 U.S. Dist. LEXIS 83836...................................21

25
26
*Cavalier v. Random House, Inc.*,
 297 F.3d 815 (9th Cir. 2002)................................................................13, 23

27
28
*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ...................................................................................2

Mitchell
Silberberg &
Knupp LLP

i

4568252.7/42500-00004

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Christian v. Mattel, Inc.*,
    286 F. 3d 1118 (9th Cir. 2002)..................................................9, 11

*Corbis Corp. v. Amazon.com, Inc.*,
    351 F. Supp. 2d 1090 (N.D. Cal. 2004) ...........................................24

*Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*,
    606 F.3d 612 (9th Cir. 2010)..........................................................24

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003) ...........................................................2, 24, 25

*Data East USA, Inc. v. EPYX, Inc.*,
    862 F.2d 204 (9th Cir. 1988)...........................................................14

*Ets-Hokin v. Skyy Spirits Inc.*,
    323 F.3d 763 (9th Cir. 2003)...........................................................17

*Funky Films, Inc. v. Time Warner Entm't Co.*,
    462 F.3d 1072, 1077 (9th Cir. 2006)..........................13, 16, 19, 21

*Gable v. Nat'l Broad. Co.*,
    727 F. Supp. 2d 815 (C.D. Cal. 2010)
    *aff'd sub nom. Gable v. Nat'l Broad. Co., Inc.*,
    438 F. App'x 587 (9th Cir. 2011)..........................................11, 21

*Grubb v. KMS Patriots, L.P.*,
    88 F.3d 1 (1st Cir. 1996) ...................................................................9

*Idema v. Dreamworks, Inc.*,
    162 F. Supp. 2d 1129 (C.D. Cal. 2001)...........................................14

*Identity Arts v. Best Buy Enter. Servs., Inc.*,
    No. C 05-4656 PJH, No. C 06-1631 PJH,
    2007 U.S. Dist. LEXIS 32060..........................................................20

*Jorgensen v. Epic/Sony Records*,
    351 F.3d 46 (2d Cir. 2003) ..............................................................11

Mitchell
Silberberg &
Knupp LLP

ii

TABLE OF AUTHORITIES

4568252.7/42500-00004
4568252.7/42500-00004

1

**TABLE OF AUTHORITIES**
(continued)

2

3

**Page(s)**

4

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ........................................................................ 2

5

6

*Mattel, Inc. v. MGA Entm't, Inc.,*
    616 F.3d 904 (9th Cir. 2010) ...................................................... 14

7

8

*Merrill v. Paramount Pictures Corp.,*
    No. CV 05-1150 SVW, 2005 WL 3955653
    (C.D. Cal. Dec. 19, 2005) ............................................................ 12

9

10

*Meta-Film Assocs., Inc. v. MCA, Inc.,*
    586 F. Supp. 1346, 1355 (C.D. Cal 1984) .............................. 11, 12

11

12

*Milano v. NBC Universal, Inc.,*
    584 F. Supp. 2d 1288 (C.D. Cal. 2008) ...................... 15, 16, 18, 22

13

14

*Milne v. Mills,*
    765 F.2d 145 (6th Cir. 1985) ........................................................ 9

15

16

*Narell v. Freeman,*
    872 F.2d 907 (9th Cir. 1989) .................................................. 13, 22

17

18

*Olson v. Nat'l Broad. Co.,*
    855 F.2d 1446 (9th Cir. 1988) .................................................... 23

19

20

*Parker v. Viacom Int'l, Inc.,*
    605 F. Supp. 2d 659 (E.D. Pa. 2009) .......................................... 24

21

22

*Pelt v. CBS, Inc.,*
    No. CV-92-6532 LGB (SHx), 1993 U.S. Dist. LEXIS 20464
    (C.D. Cal. Oct. 29, 1993) ............................................................ 15

23

24

*Pino v. Viacom, Inc.,*
    No. 07-3313 (AET), 2008 U.S. Dist. LEXIS 24453
    (D.N.J. Mar. 4, 2008) ............................................................ 20, 23

25

26

*Rice v. Fox Broad. Co.,*
    330 F.3d 1170 (9th Cir. 2003) .............................................. 15, 17, 21

27

28

Mitchell
Silberberg &
Knupp LLP

iii

TABLE OF AUTHORITIES

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rodriguez v. Heidi Klum Co. LLC*,
 No. 05 Civ. 10218 (LAP), 2008 U.S. Dist. LEXIS 80805
 (S.D.N.Y. Sept. 30, 2008) ............................................................................ 18

*Scott-Blanton v. Universal City Studios Prods. LLLP*,
 539 F. Supp. 2d 191 (D. D.C. 2008),
 *aff'd* 308 Fed. App'x 452 (D.C. Cir. 2009)............................................. 9, 23

*Selle v. Gibb*,
 741 F.2d 896 (7th Cir. 1984) ........................................................................ 9

*Twentieth Century Fox Film Corp. v. Dastar Corp.*,
 No. 98-07189 FMC (Ex), 2003 U.S. Dist. LEXIS 21194,
 (C.D. Cal. Oct. 16, 2003) ........................................................................... 25

*Williams v. UMG Recordings, Inc.*,
 281 F. Supp. 2d 1177 (C.D. Cal. 2003)........................................................ 24

*Zella v. The E.W. Scripps Co.*,
 529 F. Supp. 2d 1124 (C.D. Cal. 2007)................................................. passim

# STATUTES

15 U.S.C. § 1125(a) (Lanham Act) ....................................................................... 24

17 U.S.C. § 301......................................................................................... 2, 25

California Business and Professions Code
 §17200 .................................................................................................. 23, 25
 §17500 ...................................................................................................... 25

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004.2
4568252.7/42500-00004

iv
TABLE OF AUTHORITIES

1
2

**TABLE OF AUTHORITIES**
**(continued)**

3
**Page(s)**

4
**OTHER AUTHORITIES**

5   4 M.B. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT
6         § 13.02[A] (2011)..............................................................9
          § 13.02[B] (2011) ............................................................9
7
8   Fed. Rules of Civil Procedure
          Rule 56(a) .....................................................................2
9
    Random House Webster's Unabridged Dictionary
10        1479 (2d ed. 2001)..........................................................15

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Mitchell
Silberberg &
Knupp LLP
28

4568252.7/42500-00004.2
4568252.7/42500-00004

# I.     INTRODUCTION

To prevail on her copyright infringement claims, Plaintiff Elissa Tedesco must prove (i) that she created her treatment for a reality makeover show (the "Treatment") before Moving Defendants[1] created their television series *Plain Jane* ("*Plain Jane*"); (ii) that Moving Defendants had access to (*i.e.*, a reasonable opportunity to read) the Treatment; and (iii) that *Plain Jane* is substantially similar in copyrighted expression to the Treatment.[2]  As a matter of law, Plaintiff cannot succeed in any of these respects.

First, Plaintiff, cannot raise a factual dispute as to copying.  Plaintiff allegedly created her Treatment and sent it to one person, Defendant Sandi Pepe, late in the evening on November 10, 2009.  Conception and development of *Plain Jane* began nine months earlier, and the entire format for the series was completed before Plaintiff sent out her Treatment on November 10.  As a matter of law and logic, a prior-created work cannot infringe a later-created work.

Second, Plaintiff asserts that access exists because Sandi Pepe worked in the entertainment industry and was generally involved with reality television.  But the undisputed facts show that Ms. Pepe had no contact with any of the creators of *Plain Jane*.  The courts uniformly reject such speculative claims of access.

Third, as a matter of law, the works are not substantially similar in copyrighted expression.  Courts in the Ninth Circuit apply an "extrinsic" test to assess substantial similarity at the summary judgment phase.  Under this test, the Court must determine, *inter alia*, whether Plaintiff seeks to protect copyrightable

---

[1] Allison Grodner, Richard Meehan, Amy Palmer, Louise Roe, Fly On The Wall Entertainment, Inc., MTV Networks Enterprises Inc., Sony Pictures Television Inc., and The CW Network, LLC.

[2] Plaintiff has alleged copyright claims for Federal Direct Copyright Infringement under 17 U.S.C. § 101 *et seq.* (First Claim for Relief ¶¶ 57-69), and Federal Contributory Copyright Infringement under 17 U.S.C. § 101 *et seq.* (Second Claim for Relief ¶¶ 70-79).

Mitchell Silberberg & Knupp LLP

4568252.7/42500-00004

1

MEMORANDUM OF POINTS AND AUTHORITIES

expression or rather only unprotected ideas, premises, stock elements, public domain content, titles, and short phrases.  Here, Plaintiff seeks merely to recover for the uncopyrightable formula for a reality makeover show and for various abstract elements that arise out of the concept of a makeover show.

Finally, Plaintiff's non-copyright claims fail as a matter of law because they depend on the validity of her copyright claims.[3]  In addition, Plaintiff's Lanham Act and California Business and Professions Code claims are barred by *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003).[4]

## II.   SUMMARY OF UNDISPUTED FACTS[5]

### A.   *Defendants'* **Plain Jane** *Television Series*

Defendant Amy Palmer first conceptualized the idea and title for *Plain Jane* in or about February 2009.  SUF ¶ 4.  From the start, Ms. Palmer planned for British stylist and fashion reporter Louise Roe to host the show.  SUF ¶¶ 3-4.  In or about May 2009, defendant Allison Grodner, a television producer, became involved with the project.  She and Ms. Palmer further developed the idea for *Plain Jane*.  SUF ¶¶ 2, 5.  On May 13, 2009, Ms. Palmer created a written outline for the

---

[3] Plaintiff styles her non-copyright claims as (1) "passing off" under the Lanham Act, 15 U.S.C. §1125(a) (Third Claim For Relief, Compl. ¶¶80-92); (2) "misappropriation" under the Lanham Act, 15 U.S.C. §1125(a) (Fourth Claim For Relief, Compl. ¶¶93-102); and (3) unfair competition under California Business and Professions Code §17200 (Sixth Claim For Relief, Compl. ¶¶115-19).  Moving Defendants have not been named in the other claims for relief, which are made against Defendants Sandi and Peter Pepe.

[4] Plaintiff's state unfair competition claim also fails because it is preempted by the Copyright Act of 1976, 17 U.S.C. §301.

[5] A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Although a court must construe all facts and draw all reasonable inferences therefrom in the light most favorable to the non-moving party, the non-movant must show sufficient evidence to create a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004

1  show, and thereafter created additional written outlines (the "Palmer Pitches").

2  SUF ¶ 7.

3      On or about November 5, 2009, Ms. Grodner's company, defendant Fly On

4  the Wall Entertainment, Inc. ("FOTW") pitched *Plain Jane* to defendant Sony

5  Pictures Television Inc. ("SPT").  SUF ¶ 8.  On November 10, 2009 at 1:14 p.m.,

6  FOTW sent SPT a polished "Pitch Deck."  SUF ¶ 10.  Thus, by the afternoon of

7  November 10, 2009, all material elements of the *Plain Jane* series, as ultimately

8  broadcast, were reduced to writing.[6]  SUF ¶ 11.  The series, consisting of six

9  episodes, first aired between July and September of 2010.  SUF ¶¶ 14-15.[7]

10     *Plain Jane* is a real-life romantic comedy series.[8]  Each 60-minute episode

11 opens with the series' host, Roe, reviewing a video submitted by a young woman

12 in her early twenties (the "Jane") who wants to appear on a makeover show.  Each

13 Jane is romantically interested in a young man (the "Crush").  The Jane already

14 knows the Crush, but has been afraid to reveal her feelings for him.  Based on the

15 video footage, and sometimes on video testimonials from parents, family members,

16 or friends, Roe assesses what type of personality trait is holding Jane back from

17 pursuing her Crush.

18     Roe then visits Jane at Jane's place of employment, at a restaurant, or over

19 coffee.  The women discuss Jane's personality, dating history, stylistic choices, and

20 the Crush.  Roe surprises Jane by pulling out a mobile phone and calling the Crush

21 to ask him out on a blind date with an anonymous secret admirer (*i.e.*, Jane).  The

22

---

23 [6] On or about January 13, 2010, *Plain Jane* was pitched to The CW Network ("The
   CW").  SUF ¶ 12.  By March 2010, the pilot episode of *Plain Jane* was being
24 filmed.  SUF ¶ 13.

25 [7] FOTW and SPT co-produced these episodes.  SUF ¶ 16.  SPT then licensed the
   show to The CW for domestic distribution (SUF ¶ 17) and SPT's sister company
26 licensed the show to an MTV entity – but *not* Moving Defendant MTV Network
   Enterprises Inc. – for foreign distribution.  SUF ¶ 18.

27 [8] True and correct copies of *Plain Jane*, as aired, are attached as Exhibit 17 to the
   Declaration of James Canniffe.

28

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004

1   date is set for 48 hours later.  Roe and Jane travel through Los Angeles and watch

2   the Crush from afar.

3       Roe then asks Jane what she fears most in life.[9]  Next, Roe has Jane confront

4   her fear.[10]  Each Jane is apprehensive, but eventually accepts the challenge and

5   successfully conquers her fear.  Roe explains that telling the Crush how she feels

6   will be easy compared to the afternoon's activity.  The show then cuts to a video

7   testimonial in which Jane expresses pride in her accomplishment.

8       As a reward, Roe takes Jane on a shopping spree.[11]  They first stop at Jane's

9   home to inspect her bedroom and wardrobe.  After reviewing the bland and poorly

10  selected clothes in Jane's closet, Jane and Roe shop at an upscale location, such as

11  Rodeo Drive in Beverly Hills, where Jane tries on outfits.  Roe critiques the

12  inevitably bad choices that Jane makes, and then Jane tries on Roe's selections and

13  beams with enthusiasm over her new look.

14      Next, Roe drives Jane to another location and introduces her to an "expert"[12]

15  who will coach Jane through another confidence building exercise involving

16  flirting with men in a public location (*e.g.*, a dog park, a speed dating club, a

17  beach, a supermarket, and a softball barbeque, respectively).[13]  Roe and the expert

18  outfit Jane with a bracelet that delivers mild electrical shocks when Jane is not

19  flirting successfully.  Jane approaches some men and tries to execute strategies that

20  Roe and the expert suggest.  The exercise helps Jane overcome her fear of rejection

21

22  _____

    [9] In one episode (No. 6, "Jane Plus"), the call occurs at Jane's workplace, while
23  Roe and Jane watch the Crush.

    [10] In the six episodes, the Janes' fears were, respectively, snails, loss of control,
24  sharks, snakes, darkness, and bees.

25  [11] In five of the six episodes, Roe offers Jane a $1,000 gift card as a reward for
    completing the challenge.

26  [12] The expert is sometimes a man and sometimes a woman.  The expert changes
    from episode to episode, with only one expert appearing in two episodes.
27
    [13] Episode No. 3, "Wallflower Jane," does not include a flirting exercise.
28

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004

MEMORANDUM OF POINTS AND AUTHORITIES

1   and prepares her to confront her Crush.  Jane then gives a video testimonial in

2   which she confirms the value of the exercise.[14]

3       Next, Jane visits a hair stylist who has worked for celebrity clients.[15]  Jane

4   often shows the stylist a picture of the Crush on a mobile phone and visits

5   Facebook or Twitter to update her online profiles.  Jane learns that she will not get

6   to look in a mirror and see her made-over self until the transformation is complete.

7       Roe then whisks Jane into a limousine to drive to the date with the Crush.

8   The women discuss how Jane has grown and how she feels about the upcoming

9   date.  Often, Jane rehearses what she plans to say to the Crush and sometimes

10  breaks down in tears over the thought of revealing herself to the Crush.  When the

11  car arrives at the picturesque location, which differs from episode to episode, Roe

12  introduces Jane to a make-up artist who has worked for celebrity clients.[16]  About

13  this time, the show cuts to an interview with the Crush.  The Crush expresses

14  mixed emotions about going on a blind date.

15      As the make-up artist is finishing the last touches of make-up, Roe enters the

16  room with a surprise new dress for Jane to wear on her date.  Jane tries on the

17  dress, after which her fully made-over look is revealed to both herself and the

18  audience.  Roe and Jane reflect on what has happened and what is about to happen.

19  As Jane enters the venue where the Crush awaits, she seems simultaneously

20  excited and terrified.  Roe, who is eavesdropping, conveys her impressions to the

21  audience.  After brief hugs and awkward banter mixed with silence, Jane tells the

22

_____

23  [14] Four of the six episodes contain an additional confidence building exercise,
    either before or after the shopping scene described above.  Episode No. 1, "Friend

24  Zone Jane," includes instruction in burlesque dancing, Episode No. 3 "Wallflower
    Jane," includes mixed martial arts training, Episode No. 4, "Do Over Jane"

25  includes firing-range practice, and Episode No. 6, "Jane Plus," includes bungee
    jumping.

26  [15] The stylist changes from episode to episode, with only one stylist appearing in
    two episodes.

27  [16] The make-up artist changes from episode to episode.

Mitchell
Silberberg &
Knupp LLP
28

4568252.7/42500-00004

Crush that she wants to pursue a relationship with him.  In five of the six episodes, the Crush reciprocates Jane's romantic feelings.[17]  The new couple shares a dinner, and Roe comments to the audience on how successful Jane's transformation has been.  Finally, the show cuts to photographs of the new couple together a month or more later, enjoying themselves.  Jane holds up handwritten signs thanking Roe and informing the audience that the couple remains together.[18]

### B.   *Plaintiff's Treatment*

On November 10, 2009 at 8:31 p.m., before sending the Treatment to anyone, Plaintiff registered online with the Writer's Guild of America ("WGA") her Treatment for a 30-minute reality television show titled *Plain Jane:  From Geek to Glam*. [19]  SUF ¶¶ 20, 22.  At 9:25 p.m. on November 10 – about eight hours *after* FOTW sent the Pitch Deck to SPT – Plaintiff e-mailed the Treatment to Sandi Pepe.  SUF ¶ 23.  Based on a single, general lunch meeting with Ms. Pepe the month before, Plaintiff hoped that Ms. Pepe would show the Treatment to Ms. Pepe's contacts in the entertainment business and secure a deal for the Treatment to be produced.  SUF ¶ 25.  Ms. Pepe e-mailed Plaintiff the next day and explained that the Treatment was "way too general and not enough of a hook to differentiate from the style network show you mentioned," and was "a little soft for a TV show."  SUF ¶ 26.  Plaintiff acknowledged "I get what you mean by soft."  SUF

---

[17] In one episode (No. 5, "Conservative Jane") the Crush says he does not know Jane well enough to date her, but he then invites her to a karaoke bar "as friends."

[18] In Episode No. 5, where the Crush and Jane do not become a couple, Jane goes on a date with another man she met while filming the show, and the closing photograph montage shows images from that date.

[19] Plaintiff is a former graphic designer whose only published works are two short films; Plaintiff has never been paid for works she wrote for film or television. Before meeting Sandi Pepe, Plaintiff had never written a reality TV treatment. SUF ¶ 19.

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004

¶27.  Other than Ms. Pepe, Plaintiff never sent the Treatment to any other agent, producer, or alleged intermediary.[20]  SUF ¶¶ 28-29.

The Treatment says that the series would be "similar in format to *Queer Eye for the Straight Guy*, or *What not to Wear*," two existing reality makeover series.[21] A well-known actress or model such as Jenny McCarthy or Carmen Electra would host the series.  Each episode would begin with the host and three female experts riding in a limousine and reviewing secret videotape of the unsuspecting makeover candidate (the "Candidate"), who would be an "ordinary" woman.  According to the Treatment, the Candidates "can be frumpy housewives or studious co-eds. They can be tom-boys or 40 something soccer moms, their one common thread is that they are Plain Janes, and that their friends and family think their [sic] just might be a hidden [P]layboy bunny in there somewhere."  Then, the host and the experts, along with the Candidate's friends and family members, would "ambush" the Candidate on the street and offer her a makeover.  The makeover would focus on making the Candidate "HOT" (all capitals in original) and would "turn her into a sexy siren over night."  After the ambush, the host and the Candidate would get into a limousine and travel to the first of three stops.  At each stop, a different female expert would teach the Candidate "how to be sexy, hot and alluring." These experts would be regular cast members on the show.[22]

---

[20] In her interrogatory responses, Tedesco testified she transmitted the Treatment to only Sandi Pepe before *Plain Jane* aired.  SUF ¶ 28.

[21] Plaintiff's Treatment, which is both Exhibit 1 to Plaintiff's Complaint and Exhibit 1 to Plaintiff's deposition, is attached as Exhibit 1 to the concurrently filed Declaration of Robert H. Rotstein.

[22] The first expert would be a "Sex Appeal & Human Behavior Authority" who would help the Candidate improve her self-esteem, confidence, flirting, and dating. *Id.*  The second expert would be a "Professional Fashion Stylist" who would provide tips on style, fashion, and appearance.  The third expert would be a "Celebrity Makeup and Hair Specialist," who would improve the Candidate's hair and make-up.  Some episodes might have guest experts, such as "a runway model, belly dancer, stripper, or dancer."  There might also be episodes that include fashion photographers who surprise the Candidates with photo shoots, or

(…continued)

1   Although every episode would focus on making the Candidate sexy and

2   glamorous like a "starlet," the makeovers would be tailored to the personalities of

3   the Candidates, such that some might end up "look[ing] like Marilyn Monroe,

4   [while] others will look like Audrey Hepburn."  There would be no plastic surgery,

5   but some Candidates would get "teeth whitening, contacts, push-up bras and hair

6   extensions."

7   At the end of each episode, the Candidate's transformation would be

8   revealed at a party or event (such as a wedding, graduation, or birthday party),

9   where she would launch her new look in front of friends and family.  Sometimes,

10   boyfriends, husbands and secret crushes would be invited to the ending party to

11   give their opinions on the "HOT" new look.  The event would create a "triumphant

12   feel at the end of each episode" because both "inner and outer beauty would be

13   exposed."

14   The Treatment explains that "watching a caterpillar turn into a butterfly"

15   would inspire female audience members "who want to look prettier and sexier"

16   and "to express the sexy goddess that's in all of [them]."  The Treatment also

17   claims that "men who want to look at hot sexy women (hostess and experts, and

18   ultimately the [C]andidate)" will also enjoy the series.

19   **III.   MOVING DEFENDANTS ARE ENTITLED TO SUMMARY**

20   **JUDGMENT ON PLAINTIFF'S COPYRIGHT CLAIMS**

21   To prevail in a copyright infringement action, a plaintiff must prove (1)

22   ownership of a copyright in a work, and (2) copying by a defendant of original

23   elements of the work.  *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th

24   Cir. 2010).  "A plaintiff can establish copying either (1) by presenting direct

25   evidence of copying or (2) by showing that the defendant had access to the work

26   _____
    (…continued)

27   "dermatologists, nutritionists and fitness instructors [who] could be asked for their
    expert advice for taking care of the face and body."

28

1    and that the works at issue are substantially similar." *Bissoon-Dath v. Sony*
2    *Computer Entm't Am., Inc.*, 694 F. Supp. 2d 1071, 1078 (N.D. Cal. 2010), *aff'd*
3    *sub nom. Dath v. Sony Computer Entm't Am., Inc. and adopted by*, 653 F.3d 898
4    (9th Cir. 2011) (published without opinion).

5    ## A.   Plain Jane *Was Created Before the Treatment*

6         Where a defendant created its work before a plaintiff created hers, no
7    infringement is possible. *Christian v. Mattel, Inc.*, 286 F. 3d 1118, 1128 (9th Cir.
8    2002) ("By simple logic, it is impossible to *copy* something that does not exist.")
9    (emphasis original); 4 M.B. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT §
10   13.02[A] (2011).  ("Of course, where plaintiff's dissemination occurs only after
11   defendant's work has already been created, then access is not established.").  Thus,
12   where the uncontroverted facts demonstrate the defendant's prior creation,
13   summary judgment is appropriate.[23]  *E.g.*, *Scott-Blanton v. Universal City Studios*
14   *Prods. LLLP*, 539 F. Supp. 2d 191, 197-200 (D. D.C. 2008), *aff'd* 308 Fed. App'x
15   452 (D.C. Cir. 2009).[24]

16        Here, Amy Palmer first conceptualized *Plain Jane* after meeting Louise Roe
17   in February 2009, nine months before Plaintiff submitted her Treatment.  SUF ¶ 4.

18

19   [23] *See also Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 5 (1st Cir. 1996) ("Such prior
20   creation renders any conclusion of access or inference of copying illogical.");
     *Milne v. Mills*, 765 F.2d 145 (6th Cir. 1985) (unpublished) (affirming summary
21   judgment based on prior creation).

     [24] In some cases, "striking similarity" exists because two works are so similar that
22   copying is the only logical explanation for the similarity notwithstanding the
     absence of proof of access.  4 M.B. Nimmer & D. Nimmer, NIMMER ON
23   COPYRIGHT § 13.02[B] (2011).  However, striking similarity is irrelevant where, as
     here, the defendant establishes prior creation.  *See Selle v. Gibb*, 741 F.2d 896, 901
24   (7th Cir. 1984) ("striking similarity is just one piece of circumstantial evidence
     tending to show access and must not be considered in isolation….there must be at
25   least some other evidence which would establish a reasonable possibility that the
     complaining work was *available* to the alleged infringer.") (emphasis original).
26   Indeed, if the works were truly strikingly similar here (and they are not), the
     logical inference would be that Plaintiff, the second creator in time, copied from
27   Moving Defendants.  In any event, as discussed below, the works are not
     substantially similar, much less strikingly similar.

28

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004

By May 2009, Ms. Palmer began preparing the Palmer Pitches, which contain detailed plans for *Plain Jane*.  SUF ¶¶ 5, 7.  On November 5, 2009, *Plain Jane* was pitched to SPT.  SUF ¶ 8.  On the afternoon of November 10, at 1:14 p.m. – hours before Plaintiff sent her Treatment to Ms. Pepe – FOTW sent SPT the Pitch Deck.  SUF ¶ 10.

By the afternoon of November 10, 2009, therefore, Moving Defendants had created: (i) the title *Plain Jane*; (ii) an opening with a video diary establishing Jane's backstory and history with her crush; (iii) the premise of making over a plain-looking woman's outer appearance, as well as her inner attitude toward life and men; (iv) the format of a makeover show that would transform Jane's style and build her confidence, in preparation to for a date with a secret crush; (v) Louise Roe as a hostess who was envisioned as a "fairy godmother" and who would guide Jane through her transformation; (vi) the conception of the Janes as women who are "single, and consider themselves forgettable," and who may be "insecure, shy or just plain bad at talking to guys"; (vii) the notion of dating experts, stylists, and hair and makeup experts who would coach the Janes; (viii) non-intrusive, inexpensive makeovers that take place over 48 hours; (ix) scenarios such as "School Girl Crush," and "Best Friends"; (x) a "confidence building exercise" such as Karaoke in front of a crowd, give a toast at a wedding, or host a party; (xi) physical transformation plus confidence building; (xii) a dramatic focal point when Jane would be revealed to her secret crush; (xiii) use of the concepts of flowers and butterflies to illustrate Jane's transformation.  SUF ¶ 11.

Plaintiff's copyright infringement claims are based on her allegations that the foregoing elements were copied from her Treatment.  *Id.*  However, because the elements listed above were conceived before Tedesco sent her Treatment to Sandi Pepe, Tedesco's copyright infringement claims are precluded by Moving

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004

1   Defendants' prior creation.  *Christian v. Mattel, Inc.*, 286 F. 3d at 1128.  For that

2   reason alone, summary judgment should be granted.

3        **B.**    ***Plaintiff Cannot Raise a Disputed Fact as To Access***

4        The foregoing discussion disposes of Plaintiff's copyright infringement

5   claims.  However, even if *Plain Jane* had not been created first, Plaintiff could not

6   avoid summary judgment, because she cannot raise a disputed fact as to access.

7        "To prove access, Plaintiff must show that the Defendants had a 'reasonable

8   opportunity' or 'reasonable possibility' of viewing Plaintiff's work prior to the

9   creation of the infringing work. … Reasonable access requires more than a 'bare

10   possibility,' and 'may not be inferred through mere speculation or conjecture.'"

11   *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 824 (C.D. Cal. 2010) *aff'd sub*

12   *nom. Gable v. Nat'l Broad. Co., Inc.,* 438 F. App'x 587 (9th Cir. 2011)

13   (unpublished), (quoting *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th

14   Cir. 2000)).  Plaintiffs typically establish access by offering circumstantial

15   evidence of either: (1) a particular chain of events that led to defendant receiving

16   plaintiff's work; or (2) the widespread distribution of plaintiff's work.  *See Gable*,

17   727 F. Supp. 2d at 824.  Such evidence must be "'significant, affirmative, and

18   probative'" for the plaintiff to succeed.  *Jorgensen v. Epic/Sony Records*, 351 F.3d

19   46, 51 (2d Cir. 2003) (quoting *Scott v. Paramount Pictures Corp.*, 449 F. Supp.

20   518, 520 (D.D.C. 1978)).

21        In *Meta-Film Assocs., Inc. v. MCA, Inc.*, the court noted that claims of

22   access through a chain of events require a "nexus between the defendant and the

23   individual possessing knowledge of the plaintiff's work" or an "intermediary."

24   586 F. Supp. 1346, 1355 (C.D. Cal 1984).  This intermediary must have been

25   either (1) "a supervisor with responsibility for the defendant's project"; (2) a "part

26   of the same work unit as the copier"; or (3) someone who "contributed creative

27   ideas or material to the defendant's work."  *Id.* at 1355-56.  And, "at minimum, the

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004

28

1   dealings between the plaintiff and the intermediary and between the intermediary

2   and the alleged copier must involve some overlap in subject matter to permit an

3   inference of access." *Id.* at 1358.  Thus, in *Meta-Film*, a plaintiff's submission of

4   his script to a director who maintained an office at a studio with which he was

5   under contract failed to create a genuine issue that the studio had access to the

6   script when it produced an allegedly infringing film.  *Id.* at 1357-58.  *See also*

7   *Merrill v. Paramount Pictures Corp.*, No. CV 05-1150 SVW (MANx), 2005 WL

8   3955653, at *1, 8-9 (C.D. Cal. Dec. 19, 2005) (granting summary judgment for

9   defendants where plaintiff failed to provide any documentary evidence that he had

10  mailed his script to the defendants, or to any person associated with defendants,

11  before the defendants created a treatment for the allegedly infringing work).

12      Plaintiff does not (and could not) allege that the Treatment was widely

13  disseminated.  Rather, she predicates her access claim on her submission to Sandi

14  Pepe.  Plaintiff identifies Sandi Pepe and Peter Pepe as the only defendants who

15  had access to her work.  SUF ¶ 29.  According to Plaintiff, access exists for no

16  other reason than that Sandi and Peter Pepe were in the entertainment business, and

17  thus had contacts to whom they "could have" or "may have transmitted Ms.

18  Tedesco's reality show treatment."  SUF ¶ 30.  Thus, Plaintiff engages in rank

19  conjecture, speculating that access exists because (i) "Ms. Allison Grodner has

20  shows on CBS and VH1 [sic].  Therefore both Mrs. Pepe and Ms. Grodner had

21  connections to executives in the entertainment industry who are involved with

22  producing reality television"; (ii)  "Mrs. Pepe had connections in the reality show

23  realm to whom she could have passed Ms. Tedesco's treatment" because "Mrs.

24  Pepe recently catered a Bravo event in December 2011"; and (iii)  Sandi Pepe's

25  husband Peter "also had connections in the entertainment industry to whom he may

26  have passed Ms. Tedesco's treatment."  *Id.*

27

28

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004

12

1    Such frivolous assertions serve as a veritable primer for the type of

2    allegation that as a matter of law *cannot* support a claim of access.  There was

3    simply no nexus between Ms. Pepe and the creators or producers of *Plain Jane*,

4    much less one sufficient to support Plaintiff's access claim.  For this second,

5    independent reason, summary judgment on the copyright claims should be granted.

6    **C.    Plain Jane *and the Treatment are Not Substantially Similar***

7    Plaintiff's copyright claims fail as a matter of law for yet a third reason:  the

8    Treatment and *Plain Jane* are not substantially similar in protected expression.  To

9    prove that two works are substantially similar in protected expression, a plaintiff

10   must satisfy both an "extrinsic" test and an "intrinsic" test.  *Funky Films, Inc. v.*

11   *Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006).  On a motion for

12   summary judgment, only the extrinsic test is relevant.  *Bissoon-Dath*, 694 F. Supp.

13   2d at 1079.[25]  Where a plaintiff cannot satisfy the extrinsic test, summary judgment

14   is appropriate.  The Ninth Circuit has "frequently … affirmed summary judgment

15   in favor of copyright defendants on the issue of substantial similarity."  *Narell v.*

16   *Freeman*, 872 F.2d 907, 910 (9th Cir. 1989).

17   In cases involving reality television shows, to establish substantial similarity,

18   the plaintiff must identify "articulable similarities between the plot, themes,

19   dialogue, mood, settings, pace, characters, and sequence of events of the two

20   works." *Zella v. The E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1133 (C.D. Cal.

21   2007) (quoting *Funky Films*, 462 F. 3d at 1077).  This comparison must focus on

22   "specific, concrete elements" rather than generalizations.  *Bissoon-Dath*, 694 F.

23   Supp. 2d at 1079.  Only copyrightable elements of the plaintiff's work can be

24   infringed.  *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).

25

26   [25] Only where a plaintiff satisfies the extrinsic test will a trier of fact consider the
     intrinsic test, which focuses on the total concept and feel of the two works.  *See*
27   *Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985), *cert. denied*, 474 U.S. 826
     (1985).

28

Unprotectable elements include, *inter alia*:  (1) ideas, as opposed to expression of ideas; (2) facts; (3) elements taken from the public domain or another author; (4) expression that "merges" with ideas; (5) titles and short phrases; and (6) expression that constitutes a stock element "so 'standard' in the treatment of a given 'idea' that it constitutes a *scenes a faire,* or a 'scene which must be done.'"  *Bethea v. Burnett*, No. CV 04-7690 JFW (PLAx), 2005 U.S. Dist. LEXIS 46944, at *31 (C.D. Cal. June 28, 2005) (Walter, J.) (quoting *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1176-77 (C.D. Cal. 2001)).  Before comparing a plaintiff's work to the allegedly infringing work, the court must filter out such unprotected elements. *Bissoon-Dath*, 694 F. Supp. 2d at 1079.  Thus, courts engage in analytic dissection of works to identify what copyrighted expression is at issue.  *Id.*

Where, as here, the plaintiff's work is of limited creativity, any protection afforded the work's elements will be "thin."  *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 915 (9th Cir. 2010).  In such cases, courts require that a defendant's work include a protected element that is "virtually identical" to the plaintiff's thinly protected work.  *See id.* ("Because of the narrow range of expression, the [plaintiff's] preliminary [doll] sculpt is entitled to only thin copyright protection against virtually identical copying."); *Data East USA, Inc. v. EPYX, Inc.*, 862 F.2d 204, 209 (9th Cir. 1988) (aspects of videogames containing typical elements of karate matches were not identical).

Here, whether the test is virtual identity or substantial similarity, Plaintiff's claims against Moving Defendants fail under the extrinsic test as a matter of law. A comparison of the plot, sequence of events, characters, pace, mood, theme, setting, and dialogue reveals that *Plain Jane* is not substantially similar to the Treatment, much less virtually identical.[26]

---

[26] (For a detailed discussion of the lack of substantial similarity, *see* SUF ¶¶ 32-44 *citing* Declaration of David Ginsburg, Exhibit 14 ("Ginsburg Report").)

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004

1      ***Plot.***  A court will "look[] beyond the vague, abstracted idea of a general

2      plot" when assessing similarities.  *Berkic*, 761 F.2d at 1293.  Thus, even where two

3      works "share the same basic plot premise," that will be insufficient where "a closer

4      inspection reveals that they tell very different stories."  *Benay*, 607 F.3d at 625.

5      Plaintiff alleges that *Plain Jane* and the Treatment share a "central premise"

6      because both works involve giving an ordinary looking woman a real-life

7      makeover.  Compl., ¶ 62, Ex. 3.  Such a premise is not copyrightable.  *See Milano*

8      *v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288, 1296 (C.D. Cal. 2008) ("Plaintiff

9      simply cannot succeed in this case by claiming a copyright in the idea of a

10     television show based on a weight loss competition."); *Bethea*, 2005 U.S. Dist.

11     LEXIS 46955, at *32 ("No one can own the basic idea for a story.").  In fact,

12     Plaintiff's Treatment states that her premise comes from two preexisting shows,

13     *Queer Eye for the Straight Guy*, and *What Not to Wear*.  SUF ¶ 20.[27]

14     Moreover, that the works share the words "Plain Jane" in their titles does not

15     make them substantially similar.  *See Pelt v. CBS, Inc.*, No. CV-92-6532 LGB

16     (SHx), 1993 U.S. Dist. LEXIS 20464, at *10 (C.D. Cal. Oct. 29, 1993) (talk-shows

17     about race-relations whose titles both included "Listen Up" were not substantially

18     similar because, *inter alia*, titles and short phrases are not copyrightable).  "Plain

19     Jane" is a clichéd phrase that cannot be removed from the marketplace of ideas.

20     *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003) (The merger

21     doctrine prevents "common ideas" from being copyrighted because "otherwise, the

22     first to come up with an idea will corner the market.").[28]

23     _____

24     [27] The basic idea of a non-intrusive makeover show is not copyrightable and indeed
       is found in various iterations in numerous prior works, including *Queer Eye For*
25     *the Straight Guy* (2003); *What Not to Wear* (2001, U.K.; 2003, U.S.); *A Makeover*
       *Story* (2000); *How Do I Look* (2004); *Ambush Makeover* (2004); and *Makeover*
26     *Train* (2007).  SUF ¶ 32.

27     [28] *See also* Random House Webster's Unabridged Dictionary 1479 (2d ed. 2001)
       (defining "Plain Jane":  "a drab, unattractive, and generally uninteresting girl or
28     woman" or "simple and modest; unadorned; basic").  Furthermore, the expression
       (…continued)

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004

15

Setting aside the abstract premises for the works, the plots of *Plain Jane* and the Treatment differ. Each episode of *Plain Jane* tells a somewhat comedic, yet heart-warming story of a young woman in her early twenties who seeks out help from a stylist in a quest to improve her looks and gain enough confidence to reveal her true feelings to her Crush. The key element of *Plain Jane* is the romance and the blind date.

In contrast, the Treatment proposes a series that would tell stories about women of varying ages. It lacks the element of a romantic comedy. The women in the Treatment would be "ambushed" by their friends and family members, who have enlisted the help of an actress or model to bring out the "[P]layboy bunny" hidden inside their loved one. *Id.* Instead of consistently focusing on a young woman's interest in a young man and building toward a fairytale date between the two, the Treatment contemplates a show that might sometimes involve a "secret crush" attending a "reveal" party at the end of the show, but that would at other times involve married women and women with children, and would build toward a party filled with people eager to see how sexy the show's protagonist now looks. So, even the uncopyrightable abstract "plots" of the works differ markedly. *See Milano*, 584 F. Supp. 2d at 1291-93, 1296 (describing two reality shows about contestants who go on television to lose large amounts of weight).

***Sequence of Events.*** When compared at the concrete level of expression, as the extrinsic test requires, the sequences of events in *Plain Jane* and the Treatment do not share any elements in common. *See Funky Films*, 462 F.3d at 1077 (extrinsic test requires analysis of "the actual concrete elements that make up the sequence of events"). In fact, the Treatment lacks most of the scenes contained in

_____

(…continued)

"plain Jane" has been used for over a century, and is prevalent in the prior art, including as the title of at least four motion pictures and dozens of "Plain Jane" romance novels. There was even an episode of a makeover television show titled "Makeover Train: Plain Jane." SUF ¶ 33.

1   *Plain Jane*.  *See Zella*, 529 F. Supp. 2d at 1137, 1139 (no substantial similarity in

2   sequence of events where defendant's reality show contained scenes that plaintiff's

3   treatment did not contain).

4         Although both works, at an abstract level, do involve the introduction of a

5   plain-looking woman, followed by makeovers conducted by experts, and then an

6   unveiling of the woman's new look, these scenes are mere unprotected ideas and in

7   any event, *scènes à faire* that flow from a makeover-oriented reality show.[29]  *See*

8   *Rice*, 330 F.3d at 1177 (no substantial similarity where both works "involved a

9   magician performing an illusion as if it were a normal performance, but then re-

10  performing the same illusion and explaining to the audience how it was done"

11  because "the sequencing of first performing the trick and then revealing the secrets

12  behind the trick is subject to the limiting doctrines of merger and *scenes a faire*");

13  *Zella*, 529 F. Supp. 2d at 1135 (no substantial similarity in sequence of events

14  where only similarities were related to sequencing of "commonplace elements").

15  In fact, this sequence of scenes is present in many reality make-over shows,

16  including the shows on which Plaintiff based her Treatment, *Queer Eye for the*

17  *Straight Guy* and *What Not to Wear*.  SUF ¶¶ 32, 34.

18        Even if the order of scenes contained in the Treatment were protectable, the

19  protection would be extremely "thin" because of the limited expression involved,

20  and *Plain Jane* could only infringe on such protection if it were virtually identical

21  to the Treatment.  *See Ets-Hokin v. Skyy Spirits Inc.*, 323 F.3d 763, 766 (9th Cir.

22  2003) ("[w]hen the range of protectable expression is narrow, the appropriate

23  standard for illicit copying is virtual identity.") (quoting *Apple Computer, Inc. v.*

24  *Microsoft Corp.*, 35 F.3d 1435, 1439 (9th Cir. 1994), *cert. denied*, 513 U.S. 1184

25

_____

26  [29] *See* SUF ¶ 34, outlining *scènes à faire* of makeover shows; SUF ¶ 36, *citing*
   Ginsburg Report at 26: "most general sequence of events in makeover shows are

27  governed by the natural, linear progression of the subject encounter and
   transformation process."

1  (1995)).  Far from being virtually identical or substantially similar, the sequences

2  differ.

3      ***Characters.***  The Treatment and *Plain Jane* both include hosts; fashion, hair

4  and make-up experts; friends and family members; and crushes.  However,

5  character traits that "flow naturally from [two] works' shared premises" are not

6  protected and cannot form the basis for a finding of substantial similarity.  *Benay*,

7  607 F.3d at 626.  "[O]nly distinctive characters are protectable" (*id.*), and courts

8  must be careful "to slice or filter out" mere embodiments of stock ideas.  *Bissoon-*

9  *Dath*, 694 F. Supp. 2d at 1088.

10     Indeed, courts routinely find that stock characters from reality shows are not

11 copyrightable.  *See, e.g.*, *Zella*, 529 F. Supp. 2d at 1137 ("the generic idea to have

12 a host is not protectable"); *Rodriguez v. Heidi Klum Co. LLC*, No. 05 Civ. 10218

13 (LAP), 2008 U.S. Dist. LEXIS 80805, at *18 (S.D.N.Y. Sept. 30, 2008) ("fashion

14 industry experts, … professional models, hairstylists, [and] make-up artists … all

15 necessarily flow from the uncopyrightable idea of a fashion design reality show");

16 *Bethea*, 2005 U.S. Dist. LEXIS 46944, at *40 ("Plaintiffs cannot copyright the idea

17 of having a well-known business leader, or even more specifically Donald Trump,

18 host a reality television program.").  Moreover, the Treatment does not contain

19 protectable characters because "character is developed entirely through the

20 dynamic interaction of the contestants over the course of the program."  *Milano*,

21 584 F. Supp. 2d at 1296-97 (discussing treatment that explained that contestants'

22 "personal stories will make up an important part of the program").  Here, the

23 Treatment states that the Candidate will differ in "personality and personal style"

24 from episode to episode.[30]

25

26 ───────────────
   [30] *See* SUF ¶ 37, *citing* Ginsburg Report at 26: "'Cristen' from Episode 101 is not
27 just an abstract idea; as selected and presented on the show to the audience; she is
   instead a real person and presented as the *expression* of what would otherwise be a
   generic makeover character in ample concrete detail." (emphasis original).

Mitchell
Silberberg &
Knupp LLP
28

4568252.7/42500-00004

Even if the Treatment contained protected characters, the hosts, makeover candidates, experts, and friends and family members differ significantly in *Plain Jane* and the Treatment. Louise Roe is a British television personality, stylist and fashion reporter, while the hosts suggested by the Treatment are Jenny McCarthy and Carmen Electra, two American actresses and models.[31] Whereas the friends and family members in *Plain Jane* provide only video testimonials in support of Jane's efforts to get onto the show, the friends and family members in the Treatment conspire to get the show to "ambush" the Candidate. The female experts in the Treatment have recurring roles from week-to-week and collaborate significantly with the host from the beginning of each episode; in contrast almost all of the varying (and sometimes male) experts in *Plain Jane* appear only in the middle portion of the episode. Whereas the Crush in *Plain Jane* is a central character in every episode, provides commentary on his own mixed feelings about the blind date, interacts with Jane during a romantic date, and appears in silly "still together" pictures at the end of the show, the Treatment only refers to, as an afterthought, "secret crushes" who might be present at the end of some episodes to assess the Candidate's sexy makeover. These differences overwhelm any abstract similarities between the character types. *See Funky Films*, 462 F.3d at 1078-79 (distinguishing two "prodigal son" characters because of their differences); *Zella*, 529 F. Supp. 2d at 1137 (distinguishing hosts of cooking shows because one cooked "ineptly" while the other "add[ed] her skills and work[ed] alongside the celebrity chef"). The characters in the two works are not substantially similar, much less virtually identical.

**Pace.** *Plain Jane* and the Treatment differ in pace. The Treatment describes a fast-paced 30-minute show that follows the Candidate for 24 hours, whereas each

---

[31] Indeed, at her deposition, Plaintiff acknowledged that Roe has a different image from Jenny McCarthy and Carmen Electra. SUF ¶ 37.

Mitchell
Silberberg &
Knupp LLP

4568252.7/42500-00004

episode of *Plain Jane* is 60 minutes long and follows Jane for 48 hours before the blind date.  At the end of each episode, *Plain Jane* flashes forward in time to a month or more after the blind date.  The Treatment does not look forward in time to see how the Candidate's life has changed.  In addition, *Plain Jane* is designed to have multiple peaks and valleys, with video testimonials from Jane and her friends or family members interspersed throughout each episode to create reflective pauses in the show's development.  In contrast, the Treatment proposes a show that starts with an "ambush" and rapidly progresses toward a climactic ending, specifically the unveiling of the Candidate's new look.  *See Benay*, 607 F.3d at 628 (contrasting fast pace of plaintiff's work with the "more nostalgic and reflective" pace of defendant's work, which included "leisurely sequences"); *Pino v. Viacom, Inc.*, No. 07-3313 (AET), 2008 U.S. Dist. LEXIS 24453, at * 19-20 (D.N.J. Mar. 4, 2008) (contrasting reality show where events in sports competitions occurred "without pause" with show where athletic activities "occur[ed] at a slower pace").

**Mood.**  "Mood" refers to the "emotional tone" of a work.  *Identity Arts v. Best Buy Enter. Servs., Inc.*, No. C 05-4656 PJH, No. C 06-1631 PJH, 2007 U.S. Dist. LEXIS 32060, at *37.  Although the mood of each episode is dictated somewhat by the characters involved, *Plain Jane* as a series has the feel of a real-life romantic comedy.  Although Jane's appearance is a topic of the show, the story of each episode focuses on Jane's feelings for her Crush and builds toward an emotional blind date in a romantic atmosphere where Jane reveals (along with her new look) that she wants to pursue a relationship with the Crush.  In contrast, the Treatment primarily focuses on the Candidate's "sexy" makeover:  her personality and feelings are only secondary elements of the story.

Moreover, each episode of *Plain Jane* is about a young woman who has asked to be coached by Louise Roe.  Jane is not pulled into a makeover by her critical friends or family members who want to release her inner "[P]layboy

1   bunny."  *See Capcom Co., Ltd. v. MKR Group, Inc.*, No. C. 08-0904 RS, 2008 U.S.

2   Dist. LEXIS 83836, at *28 (character motivations impact mood).  Finally, to the

3   extent that similarities exist between the moods of the Treatment and *Plain Jane*,

4   such similarities are dictated by the formats of the works, and thus are

5   uncopyrightable *scènes à faire*.  *See Rice*, 330 F.3d at 1177 (mood of "secrecy and

6   mystery" merged with concept for show about a magician); *Zella*, 529 F. Supp. 2d

7   at 1136 ("The upbeat mood flowing from a cooking/talk-show … is merely another

8   example of *scenes a faire* and merger, common to all cooking/talk shows ….").

9       ***Theme.***  Any arguable similarities in the themes of the works are derived

10  from ideas and stock elements (*e.g.*, themes of confidence building, empowerment,

11  inner beauty, and transformation).  *See Benay*, 607 F.3d at 627 (although both

12  works "explore[d] general themes of the embittered war veteran, the 'fish-out-of-

13  water,' and the clash between modernization and traditions," no substantial

14  similarity because themes arose naturally from the premise of an American war

15  veteran who travels to Japan to fight the samurai); *Gable v. Nat'l Broad. Co.*, 727

16  F. Supp. 2d at 838. ("The ideas of righting past wrongs and good things happening

17  to good people are general storylines that have been around for thousands of years.

18  These ideas, standing alone, are not protectable.").  Otherwise the themes of the

19  works differ in important respects.  For example, *Plain Jane* is more chaste and

20  innocent than the Treatment, which emphasizes how "sexy" the Candidates and

21  other characters will be.  *See Funky Films*, 462 F.3d at 1078 (noting that significant

22  differences can outweigh similarities).  There is no virtual identity or substantial

23  similarity in themes.

24      ***Setting.***  Each episode of *Plain Jane* is set in Los Angeles, and the

25  landscapes, streetscapes, and skylines of L.A. play a prominent role in the show.

26  In contrast, the Treatment does not identify one particular city where the show will

27  be filmed.  Moreover, to the extent that the Treatment identifies specific settings,

28

1   those settings mostly differ from the specific settings used in *Plain Jane*.  For

2   example, the host in the Treatment first encounters the Candidate "on the street,"

3   whereas Roe first meets with Jane at her place of employment, a restaurant, or for

4   coffee.  In addition, the Treatment proposes large parties or events, such as

5   weddings, graduations, or birthday parties, for unveiling the Candidate's new look.

6   *Plain Jane*, in contrast, places Jane and the Crush in an intimate picturesque setting

7   for their blind date.  *See Zella*, 529 F. Supp. 2d at 1137 (contrasting works where

8   one took place in a celebrity's home and the other took place in front of a live

9   studio audience).  Courts have repeatedly found a lack of substantial similarity in

10  cases involving far more similar settings.  *See, e.g.*, *Milano*, 584 F. Supp. 2d at

11  1297 (no substantial similarity even though settings of reality shows "both [were]

12  elegant, both contain[ed] fitness equipment and comfortable accommodations,

13  [and] both offer[ed] outdoor exercise at the front door"); *Campbell v. Walt Disney*

14  *Co.*, 718 F. Supp. 2d 1108, 1114 (contrasting a work where "the main character

15  finds himself stuck in a town which is surrounded by a desert landscape" with a

16  work where "the main character is literally lost in the desert"); *Bethea*, 2005 U.S.

17  Dist. LEXIS 46944, at *37-38 (no substantial similarity where two reality shows

18  both placed scenes in a corporate "boardroom").

19        ***Dialogue.***  The Treatment contains no dialogue because reality programs do

20  not have much scripted dialogue.  *See Milano*, 584 F. Supp. 2d at 1297 (dialogue

21  "is not relevant to reality programming").  Nevertheless, Plaintiff points to

22  instances where extracted words contained in dialogue from *Plain Jane*

23  purportedly resemble words lifted from descriptive phrases used in the Treatment,

24  and cites the works' scattered common use of "Plain Jane," "transformed,"

25  "crush," "shy," "trust," "goddess," "Audrey Hepburn," "blossom," "loosen up,"

26  "confidence," and "butterfly."  Compl., Ex. 3.  None of these examples rises to the

27  level of protectable dialogue.  *See Narell*, 872 F.2d at 911 ("Ordinary phrases are

1   not entitled to copyright protection."); *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446,

2   1450 (9th Cir. 1988) ("[E]xtended similarity of dialogue [is] needed to support a

3   claim of substantial similarity.").  In addition, nearly all of the instances of

4   common usage relate to unprotectable clichés and stock phrases widely used to

5   refer to getting a makeover.  *See Pino*, 2008 U.S. Dist. LEXIS 24453, at *17

6   ("taunting and trash talking exchanges" not grounds for finding substantial

7   similarity between reality shows about sporting events).

8        In summary, as a matter of law, Plaintiff cannot satisfy even one element of

9   the extrinsic test.  Plaintiff's Complaint merely points to "random similarities

10  scattered throughout the works" that do not give rise to substantial similarity of

11  protected expression.  *Cavalier*, 297 F.3d at 825.  The Court should grant Moving

12  Defendants' motion for summary judgment.[32]

13  **IV.    THE UNFAIR COMPETITION CLAIMS FAIL AS A MATTER OR**

14  **LAW**

15       Plaintiff's Third, Fourth, and Sixth Claims For Relief, which sound in

16  federal (Third and Fourth) and state (Sixth) unfair competition law, are all

17  copyright claims in disguise.  They fail because they are dependent on the success

18  of Plaintiff's meritless copyright claim.  *See Bissoon-Dath*, 694 F. Supp. 2d at

19  1092 (dismissing claim under §17200 because it was related to failed copyright

20  infringement claim); *Scott-Blanton*, 539 F. Supp. 2d at 205 ("The court agrees with

21  the defendants' assertion that the plaintiff's claims 'are premised on the very same

22  conduct that gives rise to (and thus purely derivative of) her claims under copyright

23  law.' . . . [I]n light of the plaintiff's inability to establish that the defendants copied

24  her work, the plaintiff's claim under the Lanham Act must fail.").

25  ───────────────
    [32] Plaintiff's contributory infringement claim (Second Claim For Relief) fails
26  because her direct infringement claim (First Claim For Relief) fails.  *See A&M
    Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n. 2 (9th Cir. 2000)
27  ("Secondary liability for copyright infringement does not exist in the absence of
    direct infringement by a third party.").

These claims also fail for a separate reason.  At the heart of Plaintiff's federal and state unfair competition claims is the assertion that Moving Defendants used Plaintiff's creative material without attributing the material to Plaintiff.  In legal parlance, this is called "reverse passing off" or "reverse palming off."[33]  *See Aagard v. Palomar Builders, Inc.*, 344 F. Supp. 2d 1211, 1217-18 (E.D. Cal. 2004) (distinguishing "palming off," which involves a defendant selling its own wares under the plaintiff's name or label from "reverse palming off," which involves a defendant selling plaintiff's wares under the defendant's name or label).

Where creative materials are involved, reverse passing off claims under the Lanham Act are barred by the U.S. Supreme Court's holding in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003).  In *Dastar*, the plaintiff asserted a false designation of origin claim under 15 U.S.C. §1125(a) where the defendant distributed, under its own name, home videos containing footage from a television series previously distributed by the plaintiff.  The Court held that such a claim fails where the creator of a communicative product – as opposed to a tangible product – seeks to recover for false designation of origin.  *Id.* at 37.  *See also Parker v. Viacom Int'l, Inc.*, 605 F. Supp. 2d 659, 665-66 (E.D. Pa. 2009) (in case involving allegation that defendant incorporated aspects of plaintiff's book into a reality television series:  "Pursuant to Supreme Court precedent 'the [Lanham Act] phrase 'origin of goods' is … incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain.'"); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1116-17 (N.D. Cal. 2004) ("[T]o be a cognizable violation of the Lanham Act, reverse passing off must *always* include bodily appropriation.") (emphasis original), *rejected on other grounds by Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612 (9th Cir. 2010); *Williams v. UMG Recordings, Inc.*, 281 F. Supp. 2d

---

[33] Plaintiff inaccurately labels her Third Claim "passing off."  Compl. at 24.

MEMORANDUM OF POINTS AND AUTHORITIES

Mitchell
Silberberg &
Knupp LLP
28

4568252.7/42500-00004

1  1177, 1182-83 (C.D. Cal. 2003) (Lanham Act claims based on misappropriation of

2  creative material fail).  The courts have subsequently recognized that *Dastar* also

3  bars state unfair competition claims for reverse passing off.  *See Aagard*, 344 F.

4  Supp. 2d at 1218 ("congruent" state law claims, including claims under California

5  Business and Professions Code §§17200 and 17500, are impermissible); *Twentieth*

6  *Century Fox Film Corp. v. Dastar Corp.*, No. 98-07189 FMC (Ex), 2003 U.S. Dist.

7  LEXIS 21194, at *11-14 (C.D. Cal. Oct. 16, 2003) (same).  Plaintiff's state law

8  claim is also expressly preempted by the Copyright Act, 17 U.S.C. §301.  *See*

9  *Bethea*, 2005 U.S. Dist. LEXIS 46944, at *50 ("Unfair competition claims based

10  on allegations of misappropriation of intellectual property are preempted by the

11  Copyright Act.").

12  It follows that the Court should grant summary judgment in favor of Moving

13  Defendants on Plaintiff's unfair competition claims.

14  **V.     CONCLUSION**

15  For the reasons stated herein and in the Motion, Moving Defendants' motion

16  for summary judgment should be granted.

17

18  DATED: June 18, 2012                         RESPECTFULLY SUBMITTED,

19                                               MITCHELL SILBERBERG & KNUPP LLP

20

21  By: /s/ Robert H. Rotstein
    Robert H. Rotstein (SBN: 72452)
22  Emily F. Evitt (SBN: 261491)
    Attorneys for Defendants,
23  Allison Grodner; Richard Meehan;
    Amy Palmer; Louise Roe;
24  Fly On The Wall Entertainment, Inc.;
    MTV Networks Enterprises Inc.;
25  Sony Pictures Television Inc.; and
    The CW Network. LLC

26

27

Mitchell
Silberberg &
Knupp LLP

28

MEMORANDUM OF POINTS AND AUTHORITIES

4568252.7/42500-00004